## WESTINGHOUSE ELECTRIC & MFG. CO. v. AMERICAN ENGINEERING CO.
### No. 6157.

District Court, E. D. Pennsylvania.
Sept. 24, 1931.

Drury W. Cooper (of Cooper, Kerr & Dunham), of New York City, Harvey L. Lechner (of Synnestvedt & Lechner), of Philadelphia, Pa., and Victor S. Beam and Drury W. Cooper, Jr., both of New York City, for plaintiff.

Fish, Richardson & Neave and J. L. Stackpole, all of Boston, Mass., and Charles H. Howson (of Howson & Howson), of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This suit in equity for infringement involves United States patent to Aram, No. 1,558,215, and its reissue No. 17,416. The patent relates to mechanical underfeed stokers of the inclined type and the industrial field in which this controversy arises is the manufacture of the largest and most expensive type of such stokers, particularly designed for use in electric power plants.

The claims in issue are claim 2 of the reissue, which is identical with claim 5 of the original patent, and claims 9, 10, and 11 of the reissue.

Claim 2 of the reissue (arranged for convenience) is as follows:

"In an underfeed stoker having a combustion grate formed of alternately disposed tuyeres and retorts,

"(1) Front and rear supports for the grate,

"(2) A plurality of tie members extending between and connected to said supports,

"(3) Plates forming the side and bottom walls of said retorts secured to said tie members, and

"(4) Tuyeres bridging the spaces between and supported upon said retorts."

The claim does not specify a stoker of the inclined type, but the specification and drawing embody that type of construction.

The plaintiff and the defendant advance widely divergent views as to the essence of the patent as embodied in this claim. The plaintiff says that it is the idea of making the walls of the retorts composite, using beams (called "tie members" in the claim) and vertical plates bolted to them in such manner as to form side walls for the retorts, thus protecting the supports from the fire and at the same time making it possible to build stokers of much greater length than could be obtained by using unitary walls. The defendant says (emphasizing the thought which he finds in the words "tie members") that it is the idea of making the whole stoker a rigid grid composed of front and rear transverse castings firmly tied together by the members which form the sides of the retorts. Our first aim will be to find from all the evidence, including the history and development of the art, which of these views is correct.

The original Aram patent was applied for in 1920, and issued in 1925. Multiple

inclined mechanical stokers had been built as early as 1904, if not earlier. Up to 1920 or 1921 in all of them the inclined members running from front to rear doing duty as supports and retort sides consisted of unitary cast iron beams. From 1921 to 1926 a type was produced by the defendant in which these members consisted of a number of cast-iron plates bolted together; additional support being provided when necessary by transverse beams crossing the air box beneath the retorts.

In the type of stoker manufactured by the plaintiff until about 1920, the beam members were firmly secured to both front and rear transverse supports, but the rear (lower) transverse support itself rested upon its bed or subsupport by gravity only, and consequently the entire structure could move rearwardly if elongated by heat expansion. In the type manufactured by the defendant up to 1926 the whole construction was rigid, and there does not appear to have been any provision for rearward expansion of the structure or for absorbing the forces set up by the action of the rams upon the coal in the retorts.

In the practical operation of these early types considerable difficulty was encountered by reason of the cracking of the sides of the retorts (or, as the witnesses sometimes called them, the tuyere boxes). It is not necessary to go fully into just what combination of forces and heat caused this cracking or just how serious a matter it was. Cracks, when they occurred, had to be attended to promptly; if not, they might develop into holes burned in the sides of the retorts, or might even result in a breakdown of the entire support and a consequent collapse of a part of the stoker. Sometimes the repair work was quite simple. At other times it involved the substitution of a whole new beam member. It always meant putting the furnace out of commission for a period of time which depended upon the amount of repair work necessary.

Turning to Aram's own statement of the object of his invention, we find that one of the things he had in mind was minimizing this inconvenience. He says: "An object of the invention is to provide a grate surface composed of parts * * * which may be readily * * * replaced without materially disturbing other parts of the grate. * * * By making the side and bottom walls (of the retorts) detachable and sectional they may be removed in case of failure without disturbing the tuyeres or necessitating the removal of the retorts." In order to have detachable and sectional side walls, of course the plates had to rest on some kind of support, and a support was provided by the use of a beam.

Aram also had in mind that steel was a better load-carrying material than cast iron, but not as good for resisting great heat, so he made his plates of cast iron and his support of steel. He used an angle beam, the commonest of structural forms, for the support, and arranged the plates to form the sides and bottom of the retort inside the angle, thus protecting the beam from the heat.

I do not read Aram's third statement of his object as the defendant does. The defendant thinks that he was providing against lateral strains by fastening the beams rigidly to the front and rear supports. However, if we read on, we note that he is concerned with the effect of these lateral strains upon the unitary cast-iron structures then in common use. He says that they frequently cause failure of "the cast-iron retort forms usually employed which are subjected to uneven temperatures and rapid temperature variations and are taxed to their full capacity in supporting the grates of tuyeres." Then he points out that the structural or fabricated frames are better adapted to withstand the temperature variations and do not warp out of shape. Of course, he means the fabricated frames as he has constituted them, with the steel supports removed from the fire and protected from its direct influence by his cast-iron plates.

Aram took a structure in which a single unitary beam of cast iron performed the double function of supporting the grates or tuyeres and of confining the coal in the retorts, and substituted for it a composite structure in which the function of support was performed by a steel angle and the function of forming the retorts was performed by a series of cast-iron plates. Incidentally, but essential to the success of the device, the plates were so disposed as to protect the steel against injury from the high temperatures inside the retorts.

I do not think that Aram's use of the expression "tie members" necessarily commits him to a rigid grid construction. Two parts of an organization may be tied together quite securely without absolutely rigid joining, and it seems to me that under the Aram patent it would be quite permissible to allow some freedom of movement between the rear (lower) support of the tuyeres and, the beam members. In structures such as

the plaintiff's earlier stokers, there was a rigid grid which, however, had freedom of movement upon a steel lower support. Both plaintiff and defendant had been building such rigidly tied grates for years before Aram's patent, and that feature of it was old.

The plaintiff does not seriously contend that it involves invention to make in removable sections parts which are likely to be subjected to severe service. Of course, when the designer undertakes to sectionalize a spanning member having any considerable load to carry, it is fairly obvious that there will have to be a support of some kind, and from the various possible supporting devices it requires no particular inventive genius to select a beam of some material of superior tensile strength. This is really what Aram's patent amounts to—giving to it, as I have, the interpretation for which the plaintiff contends, and rejecting the defendant's view that it was intended to cover a rigid grate structure. It was old in many arts, and it is only necessary to refer to the earlier patents to Kenney, 1,035,359, and Fortune, 1,-180,287 and 1,243,055, to see that it was old in stokers.

Nor am I able to see invention in the arrangement of the parts for which so much is claimed. If you set out to support a row of plates by a beam, you must put the beam under the plates and not above them. If the plates form a square box or trough, you can hardly help putting the beam outside the bottom of the box rather than inside it. If the box contains fire, the beam will be protected from the fire, and, if desirable, can be made of a material which is less resistant to the fire.

Frequently, courts have found evidence of invention in the defendant's use of the patented device or in its general adoption in the commercial field. The defendant in this case does use the structure for which the patent was granted, and it has come to occupy almost the entire field. But the thing which ordinarily gives these facts whatever evidentiary value they have is absent in the present case. This contribution did not come after a protracted period of groping about by those skilled in the art for the solution of a problem of long standing. When the patentee has found something that others have been long and unsuccessfully seeking, it may furnish some evidence of the inventive quality if the question be otherwise in doubt. But here there was no very great problem to be solved when Aram applied for his patent, and nothing to indicate that, without Aram's disclosure, the really serious problem which arose later would not have been promptly met when it did appear.

What I refer to is the problem created by the urgent demand for increased steaming rates from boilers which brought into the field various competing types of fuel, principally pulverized coal. To meet this competition, it became absolutely necessary for the manufacturers of stokers to develop increased heating power for the larger types of boilers. The use of preheated air accomplished something, but in the final analysis the manufacturers found that they had to build longer stokers or abandon the field of high capacity installations to their competitors. This situation began to develop about 1922 or 1923, following tests with pulverized coal made under the direction of the Bureau of Mines in 1921.

It was impractical to increase the length of the tuyere boxes in stokers of the old type without change, because the low tensile strength of cast iron would have made necessary a large, heavy, cumbersome construction which would have been expensive to manufacture, would have taken up too much space when installed, and would have interfered seriously with the free use of preheated air which produced greater expansion in the structure and required unobstructed air boxes. The supporting steel beam would be the natural answer of any engineer called upon to build longer spanning members.

I have suggested that Aram started out with the sole purpose of sectionalizing the sides of the retorts or tuyere boxes and added the beam for necessary support for the plates. But I would not hold that there was invention present even if I thought that Aram had consciously before him the problem of lengthening the tuyere boxes to meet these new requirements. Where a member, because of its material or composite structure, has not sufficient strength to support itself when lengthened, the use of a beam of superior strength is as old as history.

From either standpoint Aram's patent does not embody any inventive idea or patentable novelty. He used a simple expedient well known in every kind of construction to meet a problem which was not causing very serious trouble. Subsequently the same expedient was widely resorted to in order to meet another problem which threatened the existence of the entire industry, but which no one was greatly concerned with at the

time Aram applied for his patent, because the machines were satisfactory as conditions then were. The fact that it proved adequate to the larger service does not invest Aram's idea with the quality of invention. It is idle to speculate whether the defendant knew of Aram's patent or whether, if so, it assisted it in developing its alleged infringing types of stoker. I am satisfied that the developments in the art involved the application of fundamental, well-known, and familiar devices, and were mere improvements without invention.

I have substantially adopted the plaintiff's interpretation of the meaning and scope of the patent. If this is correct, the defendant's attack upon the claims of the reissue as broadening claims, invalid because of intervening rights, is beside the point. Unless the original patent was for a rigid grid construction, the claims of the reissue do not broaden it in any particular.

My conclusion is that both the original patent and the reissue are void for want of patentable novelty.

The bill may be dismissed, with costs.